William Andrew HUSBAND, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. A–17433.

Court of Criminal Appeals of Oklahoma.

Nov. 8, 1972.

Frank R. Courbois, Oklahoma City, for appellant.

Larry Derryberry, Atty. Gen., Michael Cauthron, Asst. Atty. Gen., Daniel J. Gamino, Legal Intern, for appellee.

## OPINION

BUSSEY, Presiding Judge:

Appellant, William Andrew Husband, was charged, tried and convicted in the District Court of Oklahoma County, Oklahoma, for the offense of manslaughter in the First Degree; his punishment was fixed at ten (10) years imprisonment, and from said judgment and sentence, an appeal has been perfected to this Court.

At the trial, John Hartley testified that he was the manager of the Universal Guard Service in Oklahoma City wherein the defendant was employed. At approximately 6:15 p. m. on April 7, 1971 he received a telephone call from the defendant who inquired if he could get someone to work for him that night. Hartley replied that it was kind of late to find a replacement and the defendant stated, " 'You are going to have to because I just shot my wife.' " (Tr. 11) Hartley inquired if he had notified the police and the defendant replied, " 'No, but I'm going to.' "

Carl Husband, the defendant's brother, testified that shortly after 6:00 on the evening in question, he received a telephone call from the defendant. The defendant said, " 'I have got bad news' ", " 'I just shot June.' " Carl replied that this was not anything to "kid" about and the defendant said, " 'No, she came at me with a butcher knife and she is laying right here on the couch dead now' ". (Tr. 28)

Officer McBride testified that he received a call to the police dispatcher to go to 1612 S.W. 33rd Street in Oklahoma City. Defendant came to the front door and in response to a question of what happened, answered, " 'My wife tried to stab me and I shot her.' " (Tr. 33) He observed a white female half sitting, half lying on the couch and after ascertaining that she was dead, advised the defendant of his constitutional rights. He asked the defendant what he did with the gun and defendant took him to a store room and pointed to a cardboard box. A .38-caliber revolver was lying in the box.

Officer DeLaughter testified as to his observances at the scene. His testimony did not differ substantially from that of Officer McBride.

Officer James testified that he took various photographs at the scene and took custody of the revolver. The gun contained three empty casings and two live rounds. He also took custody of two projectiles which fell out of the victim's clothing and a projectile which had been fired through the couch. One of the pictures

depicted the victim lying on the couch with a knife in her hand.

Dr. Cooper testified that he was employed as an Oklahoma County Medical Examiner. He examined the body of defendant's wife at the scene and ascertained that she died of two gunshot wounds in the chest. The gun was fired at a very close range and the person that fired the gun was "probably standing above the person."

Ray Lambert, a firearms examiner with the Oklahoma State Bureau of Investigation, testified that he received the revolver and three lead bullets from Officer Revels of the Oklahoma City Police Department. In his opinion, one of the bullets was fired from the revolver. The other two bullets received "enough surface damage that I could not determine whether they were fired in this particular gun." (Tr. 87) He conducted an examination of the dress worn by the victim and said in his opinion the gun was in contact with the garment when it was fired.

Betty Rudberchit, the deceased's daughter, testified that on the morning of April 7, 1971 she accompanied her mother to the Stockyards Bank. Her mother checked with the loan department concerning money the defendant had recently borrowed from the bank. Upon leaving the bank, she and her mother proceeded to an attorney's office who was employed to start divorce proceedings against the defendant. Her mother dropped her off at her home and returned to work. She attempted to call her mother shortly after six and the line was busy. She called back around 6:30 and talked to Officer McBride.

Officer Damron testified that he transported the defendant from the scene to the police headquarters. He advised the defendant of his Miranda rights and the defendant stated, "that he was sorry that he had done it, but it had been a long time in coming; that he and his wife had had trouble concerning relatives or family. He stated that she had attempted to stab him with a knife and he shot her twice." (Tr. 115)

Betty Rudberchit was recalled and testified that her mother was right-handed.

The defendant testified that he and his wife had been married nine years. On the afternoon in question, his wife came home about 5:20 and started arguing with him concerning the money he had borrowed at the bank. He testified that he had borrowed the money to help his daughter, Patty, pay some bills. She continued to argue with him and told him that she wanted him out of the house that evening. He went outside to cool off. He stayed outside approximately five minutes and when he returned she was sitting on the couch with a six-inch boning knife in her hand. She continued to argue and insisted that he get out that evening. He attempted to quiet her down and she said "Nothing doing, I want you out of the house" and raised up with the knife. He testified that, "I guess I shot her, but I don't remember ever shooting her?" He testified that he did not remember getting the gun and that he was "just in a daze." When he regained his senses he called his attorney, George Miskovsky. He then called his brother and Mr. Hartley. He testified that he loved her and did not intend to kill her. Although they had argued in the past, neither he nor she had ever assaulted one another. He denied having pointed a gun at her previously.

Ruth Bryson, the defendant's daughter, testified that the defendant called her about 9:45 p. m. on the day in question and told her that he was in jail and that he had shot June after she had come at him with a knife. She testified that she believed his testimony and that his reputation and character in the community was very good.

Patty Husband, another daughter of the defendant, testified that she talked to her father about 5:30 on the afternoon in question. Defendant told her that he had borrowed some money and he was sure that she (the victim) was going to jump on him when she came home. She further testified that his reputation in the community was very good and that she believed his testimony.

William Melot and Bruce Swanson were called as character witnesses for the defendant.

Carl Husband was recalled and testified that his brother was not a violent person and that he had never known him to assault another human being.

Patty Husband was recalled and testified that the defendant's son had been killed with a knife.

Vernon Denley testified that he lived next door to the defendant and the deceased and that he had never had a better neighbor than the defendant.

George Miskovsky testified that he was an attorney in Oklahoma City. On the evening in question, the defendant called him and stated that he had shot his wife. The defendant stated to him that he didn't have anything to live for and he felt like shooting himself. Miskovsky said, "Oh, my God, don't do that" and told the defendant to tell him what had happened. He stated that she had tried to kill him with a knife. Miskovsky advised the defendant to put the gun down and to wait there and he would call the police. He testified that the defendant was sobbing and crying.

Betty Rudberchit was called in rebuttal and testified that in July of 1968 she was at her mother's house. The defendant came into the room and asked her what she was doing there "nosing in." Defendant pointed a gun in their general direction and said, " 'Do you know that you both could die in this back room.' " (Tr. 244) Her mother told her to go home and she would be all right and to not worry about her.

■ The first proposition asserts that "the trial court erred in failing to sustain the defendant's demurrer and motion to dismiss at the close of the state's evidence for No. 1—insufficiency in proving the exact cause of death, and No. 2—insufficiency in establishing any premeditated intent on the part of the defendant to cause the death of his wife." Defendant argues that the State failed to definitely establish the

cause of death absent testimony that an autopsy was performed. We are of the opinion that the State introduced sufficient evidence to prove the cause of death. Dr. Cooper, a county medical examiner, testified that it was his opinion that the deceased died of gunshot wounds in the chest. In Mayberry v. State, Okl.Cr., 449 P.2d 912, we held that the testimony of the attending physician, based only on visual examination, was sufficient to prove cause of death.

■ The defendant next argues under this proposition that the evidence was insufficient in establishing any premeditated intent on the part of the defendant to cause the death of his wife. Title 21 O.S., § 711, provides in part:

"Homicide is manslaughter in the first degree in the following cases:

"1. When perpetrated *without a design* to effect death by a person while engaged in the commission of a misdemeanor.

"2. When perpetrated *without a design* to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide." (Emphasis added)

It is thus apparent that the State of Oklahoma is not required to prove a premeditated intent to effect death in a first degree manslaughter case. We are of the opinion that the trial court properly overruled defendant's demurrer to the evidence. The question as to whether the defendant committed an excusable or justifiable homicide or was acting in self-defense was properly presented to the jury. We therefore find this proposition to be without merit.

■ The final proposition asserts that the punishment is excessive. We have previously held that the question of excessiveness of punishment must be determined by a study of all the facts and circumstances in each case and that we do not have the power to modify a sentence unless we can

conscientiously say that under all facts and circumstances, the sentence is so excessive as to shock the conscience of the Court. Severs v. State, Okl.Cr., 477 P.2d 695. In the instant case, we cannot conscientiously say that the sentence of ten (10) years imposed shocks the conscience of this Court.

The judgment and sentence is affirmed.

BRETT, J., concurs.