**Barney I. G. CHILES, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. A–16143.**

Court of Criminal Appeals of Oklahoma.

March 13, 1973.

Rehearing Denied April 26, 1973.

Robert E. Shelton, and Robert W. Pittman, Savage, Gibson, Benefield & Shelton, Oklahoma City, for appellant.

Larry Derryberry, Atty. Gen., and H. L. McConnell, Asst. Atty. Gen., for appellee.

## OPINION

BLISS, Presiding Judge.

In the District Court of Oklahoma County, State of Oklahoma, Case No. CRF–69–1838, the appellant, Barney I. G. Chiles, hereinafter referred to as defendant, was charged and tried for the offense of Murder and convicted for the lesser included offense of Manslaughter in the First Degree. His punishment was fixed at four (4) years imprisonment; and from that judgment and sentence he has perfected his timely appeal to this Court.

At the trial, Rosetta Douglas, the wife of the deceased, testified she and the deceased owned a duplex 1304 N.E. 7th Street, Oklahoma City, Oklahoma. The defendant, the resident in the west unit of this duplex, over a period of time had plumbing difficulties in his unit. The

defendant had remedied this situation by allowing water to run continuously from one of the sinks in the apartment. The running water resulted in an increase in the water charges assumed by the landlord under the terms of the lease. On Sunday, July 27, 1969, in response to a demand from the defendant to have a plumber repair a stopped-up sink, Mrs. Douglas talked with the defendant at his church. She requested the key to the unit, which he refused, stating he would not permit her entry. On the following Monday, the deceased shut off the water at this apartment. During the nighttime on July 29, 1969, the deceased again went to this unit without giving advance notice to the defendant, with the intent of shutting off the water to this apartment.

Officer Gary Smith of the Oklahoma City Police Department testified that, on July 29, 1969, he was dispatched to the defendant's apartment at 10:25 P.M. Upon arrival, he was directed to the basement beneath the duplex unit adjoining the defendant's apartment. His description of the premises revealed there was an excavated basement beneath the east unit of the duplex. From this basement, entry to the area beneath the west unit, an area with an approximate two and a half (2½) to three (3) foot floor to ground clearance, could be gained through an opening. Looking through this opening, he observed the deceased lying beneath the west unit approximately ten feet from the basement. After he made this observation, he was admitted into the defendant's residence. In response to preliminary investigation questions, the defendant informed Smith the deceased was underneath this apartment for the purpose of shutting off his water. The defendant took Smith to the kitchen and showed him an opening beneath the sink, created by the removal of loose boards. Smith's testimony revealed the defendant stated he had conversed with the deceased through this opening and after the deceased started "cursing him" he left the kitchen and returned to the living room.

Officer Ron McEwen, an Oklahoma City Police Department Homicide Detective, testified that pursuant to the homicide investigation in question, he and Officer Whooten entered the basement of the duplex and observed the deceased. While Whooten remained in the basement, McEwen was admitted to the defendant's apartment and from his apartment he moved the defendant to his police cruiser. While in the cruiser and after being informed of his constitutional rights, the defendant stated he and the deceased had become involved in an argument over a water problem. The defendant further stated he did not own a gun nor had he ever used one. Finally, McEwen identified State's Exhibit Number One (1), a .38 caliber S & W revolver found in the defendant's bedroom.

Officer Larry Upchurch, of the Oklahoma City Police Department, testified he conducted a follow-up investigation of this incident. In a fifteen minute interview with the defendant at the City Jail, subsequent to giving *Miranda* warnings, the defendant stated while he was in his apartment on the preceding evening, he heard a noise underneath the floor of his kitchen in the basement of the apartment. He walked to the kitchen and removed a board from beneath the kitchen sink to determine its source. He discovered the deceased under the kitchen sink using a wrench on the pipes. The defendant stated he asked the deceased what he was doing to which the deceased responded with, "Get the hell out of the way". He walked to the bedroom, retrieved a .38 caliber revolver, returned to the kitchen, crouched down, and pointed the pistol at the deceased. The deceased swung a Stillson wrench at him, he jumped back, and the gun discharged. The defendant did not say whether this shot was fired either accidentally or intentionally. The defendant stated further he did not give this information to the investigating officer at the scene because he "blanked out" and did not remember anything until this following morning.

N. L. Barber, Identification Officer for the Oklahoma City Police Department, tes-

tified he investigated the premises on the evening of the incident and found the body of the deceased lying approximately four feet south of the opening underneath the sink, fifteen feet from the basement opening. Photographs were introduced into evidence showing the location of the deceased and characteristics of the premises. Further, he stated he conducted a nitrate test on the defendant's hands in an effort to determine who had discharged this firearm. This test revealed a large amount of nitrate on the defendant's hands.

The testimony of Officer Bill Whooten revealed substantially the same information as the preceding witnesses, adding further that his inspection of the premises revealed a wrench clamped to the shut-off valve underneath the sink and a red-handled screwdriver lying next to the deceased. He stated he did not find the pipe wrench mentioned by the defendant.

Mrs. Ora B. Walker, a neighbor of the defendant living in the unit adjoining the defendant's apartment, testified that she also had difficulties with water service in her apartment, but at her request the Douglases had made the proper repairs. Further, she stated on the night of July 29, the deceased, who was carrying a wrench when he met her at her door, borrowed the red-handled screwdriver found at the scene of this incident. After lending him this screwdriver and permitting him entry to her basement, she could hear noises beneath the duplex which she determined to result from his working on the pipes. Shortly thereafter, she heard what she determined to be a gunshot. She did not hear any arguments prior to the gunshot.

Thereafter, counsel stipulated the cause of death to be the bullet wound inflicted. Thereafter, the State rested.

For the defense, Loyd Benefield, an Oklahoma City attorney, testifed he was contacted for counseling over the water problem related previously, and stated further that he had a telephone conversation with the Douglases regarding the circumstances. During the conversation, he was informed the deceased wished to have the defendant removed from the premises. From the discussion, Mr. Benefield was informed that the rent for the period had been paid in advance and as a result of this information, he advised the Douglases of the Statutory Notice Period required for the termination of the lease. Also, during this conversation the deceased, in a display of temper, related the experience on Sunday, July 27, conversation between the defendant and Mrs. Douglas, further stating, "He should have bashed him in the head." Shortly after this display of temper, the conversation terminated.

The defendant testified he was a part-time Baptist Minister and carpenter, further revealing that in 1961 he had been previously convicted for the offense of Assault and Battery. He described the plumbing difficulties he had with his apartment and the resulting conversation of July 27, with Mrs. Douglas over the difficulty. In response to her request for his key, he explained to her he would be home approximately an hour after their conversation and would permit her entry at that time, but would not permit it prior to that time. On Monday, he phoned Mrs. Douglas and asked why his water had been shut off the previous night. After this conversation and with the advice of counsel, he turned his water back on.

In his description of the details of the incident resulting in the death of Wardress Douglas, he stated that at approximately 9:30 P.M., he and his wife retired for the evening. While he was in his bed in the living room watching television, he heard a noise in the kitchen. He took his gun from beneath the mattress and walked to the kitchen, discovered the source of the noise to be beneath the sink, opened the cabinet, lifted a board covering the opening in the floor and asked who was underneath his house. The person replied, "It's Douglas". He asked what he was doing underneath the house to which the deceased replied he was "shutting his damn water off". The defendant asked him why, he

replied, "To stop it from running". The defendant told him it wasn't running and told him to see for himself. The defendant then leaned over the opening, the deceased swung or jabbed at him with a pipe wrench, he sat up and the deceased stated he was going to "Punch his goddam eyes out", swung at him again, the defendant jumped back, and the gun discharged. He stated after that he "went blank", and did not remember anything else that happened that evening.

Mrs. Ruby Chiles, the wife of the defendant, stated at the time of the incident she walked in just as the gun went off. After the incident, the defendant was nervous and suffered from a lapse of memory. Further she stated that Defendant's Exhibit Numbers Eight and Nine, a wrench and water key, respectively, were at her request retrieved from beneath the house by Mr. Thomas J. Macklin.

Thomas J. Macklin testified he retrieved Defendant's Exhibit Numbers Eight and Nine and passed them through the opening in the floor to Mrs. Chiles. He stated at the time he found the wrench, Defendant's Exhibit Number Eight, it was still affixed to the water valve key.

Mr. H. E. Houston, Mrs. Ilene Scarmucci, Mrs. Louise Blakeburn, and Mrs. Helen Ragan Smith, testified the defendant maintained a good reputation in the community as a law abiding citizen. Thereafter, the defense rested.

■ In defense counsel's first proposition, it is asserted the Court erred in overruling the demurrer to the state's evidence in overruling the defendant's motion to dismiss, and in refusing to direct a verdict on behalf of the defendant for the reason that the evidence is not sufficient to support a jury's verdict and prove specific intent, the requisite intent counsel determines necessary in the offense of Manslaughter in the First Degree. Title 21 O.S.1971, § 711, the authority for this offense, states as follows:

"Homicide is manslaughter in the first degree in the following cases:

"1. When perpetrated without a design to effect death by a person while engaged in the commission of a misdemeanor.

"2. When perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide.

"3. When perpetrated unnecessarily either while resisting an attempt by the person killed to commit a crime, or after such attempt shall have failed."

The terms design and specific intent are generally construed to be synonymous, with the language "with design" requiring proof of specific intent as an element of the offense. Polk v. State, Fla.App., 179 So.2d 236 (1965). Further, this Court has determined the phrase "without a design" in the above statute excludes the necessity of proving premeditated intent in proving the offense of Manslaughter in the First Degree. Husband v. State, Okl.Cr., 503 P.2d 563 (1972). In construing the language in the above statute, we find the language "without a design to effect death" clearly establishes proof of specific intent is not necessary in a First Degree Manslaughter prosecution. Since specific intent is not an element of this offense, our determination of the sufficiency of the evidence in supporting this conviction is addressed to whether the proof establishes the elements of the offense as a lesser included charge incompassed in a murder prosecution. We find substantial circumstantial evidence from which a reasonable and logical inference of guilt arises. This evidence is sufficient to support the jury's verdict. Brewer v. State, Okl.Cr., 452 P.2d 597 (1969).

Counsel, in his second proposition, assigns as error the Court's failure to submit his requested Instruction Number Ten. That instruction reads as follows:

"You are instructed that the area underneath the floor of the house of the defendant is a part of his home, and that the entry of the deceased into that area

in the nighttime, without notice to the defendant by opening a door or lifting a latch to make the entrance, with the intent to rearrange some of the property under the house or to remove some of the property that was under the house, would be a felonious act on the part of the deceased, and the defendant, as a matter of law, would have the right to use such force as was necessary to resist such nighttime entrance."

We note in studying the record the Court's Instruction Number Eight submitted to the jury a property owner's right to defend his domicile. In a careful study of this instruction, construed with the Court's Instruction Number Ten, and the excusable and justifiable homicide instructions, we find a reading of these instructions in their entirety fairly instructed the jury on this principle of law. We find the language of the defendant's instructions, to some extent, invades the province of the jury. However, even if counsel's requested instruction, in the abstract, could be construed a fair statement of the law, when the trial court's instructions in substance fairly charges the jury on a principle of law raised in the requested instruction it is not error to reject the requested instruction. Barber v. State, Okl.Cr., 388 P.2d 320 (1963); Owens v. State, Okl.Cr., 438 P.2d 21 (1968).

Defense counsel submits in his third proposition the Court's Instruction Numbers Three and Seventeen were improperly submitted to the jury as the proof in the instant case does not warrant an instruction on the offense of murder. Further, he submits the court erred in not submitting for the jury's consideration the lesser included offense of Manslaughter in the Second Degree.

In reviewing counsel's first contention, we find the circumstantial evidence sufficient in establishing the necessary and logical inferences in the proof of the elements of murder. Therefore, the determination of the defendant's guilt or innocence for this offense was properly submitted to the jury. Since the instructions clearly and accurately set forth the law applicable to the offense, the court committed no error in submitting this portion of the instructions to the jury.

Further, defense counsel contends the court should have, on its own motion, instructed the jury on the lesser included offense of Manslaughter in the Second Degree. At the trial the defense submitted eleven requested instructions, none of which included a requested charge on Second Degree Manslaughter. The court instructed the jury on both excusable and justifiable homicide, conscientiously covering all theories warranted by the evidence and raised by the defense. In this regard, we note we have repeatedly held that if special instructions are desired by the defendant, he is required by the provisions or our code of criminal procedure to present in writing to the court, instructions desired, and it is not error for the trial court to omit to instruct upon every possible question under the defendant's theory of the case, when he has not requested such instructions. Glenn v. State, Okl.Cr., 333 P.2d 597 (1958). In light of the fact, the record does not reflect a request for this instruction nor was a written instruction submitted on this point, we find the defendant was not deprived of a substantial right under the evidence presented. This is particularly evident from the fact that the evidence counsel submits as supporting a conviction for Second Degree Manslaughter is the same evidence which is in support of the excusable homicide instruction, which, if believed, would have resulted in the defendant's acquittal.

In the defendant's fifth proposition, he assigns as error the trial court's restriction of his cross examination of a police officer on police department policies regarding reducing statements received from an interrogation to signed written statements. In the instant case, the questions to which the court sustained the prosecutor's objections alluded to an inquiry into whether the department had a policy of reducing all statements to writing with the signature

of the declarant included. In a close study of the record, we note on direct examination this officer specifically testified the defendant refused to sign a written statement, but was willing to discuss the circumstances surrounding the incident. Therefore, in light of the evidence received on direct examination, the line of inquiry had little if any, impeachment value. The restriction of the defendant's cross examination under these circumstances manifests no prejudice to the defendant and at most could only be considered a harmless error.

■ Finally, counsel in his fourth proposition asserts the arguments of the prosecutor were prejudicial in form and substance. We note in reviewing the arguments of the prosecutor that although at points arguments were not technically correct in every detail, they were not abusive or prejudicial in their content. Coupling the nature of the arguments with the fact that the minimum penalty was imposed for the offense, we find no manifestation of prejudice resulting from these arguments.

> "This Court does not condone the language used; however, it is difficult to say that the defendant was prejudiced thereby to the extent of requiring reversal. The conflict in the testimony was determined in favor of the State. We are of the opinion that there was competent evidence upon which the jury based their verdict. The punishment assessed by the jury was the minimum provided by law. In view of such a verdict, prejudice is not indicated. The judgment and sentence of the trial court is therefore affirmed."

Fulks v. State, Okl.Cr., 481 P.2d 769 (1971). We, therefore, find this proposition to be without merit.

Therefore, the judgment and sentence is affirmed.

BUSSEY, J., concurs.

BRETT, Judge (dissenting).
I believe this should be remanded for new trial with instruction for Second Degree Manslaughter to be given.